**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

EDWARD M. DUNN,
            *Plaintiff-Appellant,*

v.

RONALD T. BORTA; PETER C.
LINZMEYER; LESLIE A. DAVIS,
            *Defendants-Appellees,*            No. 03-1362

and

RONBOTICS CORPORATION,
            *Defendant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-02-952-A)

Argued: January 20, 2004

Decided: May 19, 2004

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

---

Reversed and remanded by published opinion. Judge King wrote the opinion, in which Judge Duncan joined. Judge Niemeyer wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Raymond Charles Fay, BELL, BOYD & LLOYD, P.L.L.C., Washington, D.C., for Appellant. Sally Ann Hostetler,

ODIN, FELDMAN & PITTLEMAN, P.C., Fairfax, Virginia, for Appellees. **ON BRIEF:** Andrew North Cook, Michael Jay Schrier, BELL, BOYD & LLOYD, P.L.L.C., Washington, D.C., for Appellant. Bruce Michael Blanchard, ODIN, FELDMAN & PITTLEMAN, P.C., Fairfax, Virginia; Christopher Ivan Kachouroff, ROBERT H. KLIMA & ASSOCIATES, Manassas, Virginia, for Appellees.

---

## OPINION

KING, Circuit Judge:

Plaintiff Edward Dunn appeals the decision of the Eastern District of Virginia, rendered in February 2003, dismissing his securities fraud claims against defendants Borta, Linzmeyer, and Davis for failure to state a claim upon which relief can be granted, *see* Fed. R. Civ. P. 12(b)(6), and for failure to plead fraud with particularity, *see id.* 9(b). Dunn maintains that he was defrauded out of more than a half-million dollars on his investment in Ronbotics Corporation and that the court erred when it dismissed the claims he asserted under the Virginia Securities Act. As explained below, Dunn's Virginia state law claims pass muster under the applicable pleading requirements, and we reverse and remand.

I.

A.

Ronbotics Corporation is a privately held Virginia corporation founded to develop and manufacture electric motion platforms, used primarily in arcade games and training simulators. Ronbotics was operated, in part, by the individual defendants: Ronald Borta, its Chief Technology Officer and Chairman of the Board; Leslie Davis, its President and Chief Operating Officer; and Peter Linzmeyer, its Chief Executive Officer (collectively, the "Defendants").[1]

---

[1] The facts set forth in this section are taken from Dunn's amended complaint, which, for purposes of appeal, we must accept as true. *See De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991) ("The court, in deciding a 12(b)(6) motion, must take all wellpleaded material allegations of the complaint as admitted and view them in the light most favorable to the plaintiff.").

In January 2001, Ronbotics approached Edward Dunn about investing in its business, providing him with a Confidential Information Memorandum (the "Memorandum") describing Ronbotics's current and proposed product lines, business prospects, assets, and marketing strategy, and including financial reports and other information. The Memorandum asserted that "Ronbotics has developed proprietary motion control technology currently embodied in its patented electric motion platforms" and that "[t]he low cost of Ronbotics' patented platforms is attributable to its proprietary mechanical and systems designs, proprietary software and trade secret manufacturing processes."

In addition, the Memorandum made several representations concerning Ronbotics's business prospects. For example, it asserted that major manufacturers such as SEGA, Namco, and Gaelco were designing products using the Ronbotics platform, and it specified the stage of development for each of these companies' designs. The Memorandum further asserted that Ronbotics was involved in discussions with General Electric and other major distributors regarding Ronbotics's products and that it had sold 225 units of its principal product, the CoasteRider, prior to January 2001. Finally, the Memorandum made projections about Ronbotics's future growth and asserted that the company was negotiating with a manufacturing facility in Oklahoma to handle overflow production.

During the third week of January 2001, Dunn met with Borta and Linzmeyer to discuss his possible investment in Ronbotics. At the meeting, which lasted several hours, Dunn was asked to invest $500,000 in the company by purchasing its stock at $3.00 per share. When he expressed doubt that Ronbotics's stock was worth that price, Linzmeyer and Borta suggested that Dunn instead purchase a convertible subordinated note issued by the company. Dunn then voiced concern that Ronbotics did not possess sufficient assets to satisfy such a note if the company went bankrupt. Linzmeyer and Borta responded that Ronbotics owned two patents, one for a motion pinball machine and one for the electric motion platform used in the CoasteRider; that the patents were "worth millions"; that an outside investment firm had valued the patents at between $2 million and $4 million; and that the patents were the company's primary assets. When Dunn inquired as to the protections Ronbotics had in place to ensure that competitors

did not misappropriate its technology, Linzmeyer and Borta represented that the company's patents protected against such misappropriation.

On January 31, 2001, Linzmeyer, on behalf of Ronbotics, executed a convertible subordinated note (the "Note"),[2] by which Ronbotics promised to pay Dunn the principal sum of $500,000 on January 31, 2004, plus ten percent interest per annum, payable on the first day of each calendar quarter. Ronbotics made the Note's first required interest payment to Dunn on April 1, 2001, but it failed to make any subsequent interest payments through October 1, 2002. Exercising his rights under the Note, Dunn then demanded immediate payment of all principal and interest due thereon. The Note was not paid, and Ronbotics subsequently filed for bankruptcy in the Eastern District of Virginia bankruptcy court.

## B.

On June 28, 2002, Dunn filed a complaint in the Eastern District of Virginia against Ronbotics and the Defendants, alleging violations of federal and state securities laws, common law fraud, and breach of contract. Ronbotics did not enter an appearance in the action, but the Defendants filed motions to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[3] On October 15, 2002, the court granted the motions to dismiss without prejudice, but authorized Dunn to amend his complaint.

On October 29, 2002, Dunn filed an amended complaint, naming the same defendants, which is the operative complaint in this appeal (the "Complaint"). The Complaint made numerous factual allegations against the Defendants. First, it alleged that the Defendants had authored and approved the Memorandum, which contained false and

---

[2]The Note gave Dunn the option of converting it into shares of common stock in Ronbotics and provided that it was subordinated in right of payment to all existing and future secured indebtedness of Ronbotics.

[3]Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 12(b)(6) authorizes motions to dismiss for "failure to state a claim upon which relief can be granted.

misleading statements in that it referred to Ronbotics's patented products, even though the patents were only pending when the Memorandum was provided to Dunn. Complaint ¶¶ 18, 30, 32. The Complaint further alleged that the Defendants orally made false statements concerning the existence and value of the patents and failed to disclose that Borta, the inventor, had retained certain reassignment rights in the patents. Complaint ¶¶ 31-32.

Next, the Complaint alleged that the Memorandum contained false and misleading statements regarding the status of Ronbotics's business. Complaint Part G. In particular, the Complaint alleged that, contrary to the Memorandum, SEGA, Namco, and Gaelco were not in the process of designing products using Ronbotics's motion platform. Complaint ¶¶ 36-39. The Complaint further alleged that Ronbotics had never engaged in substantive discussions with General Electric and had never been in serious negotiations with any other major distributors. Complaint ¶¶ 40-43. Also, according to the Complaint, the Memorandum falsely asserted that Ronbotics had sold 225 Coaste-Riders, when in fact the company had not sold anywhere near that number prior to January 2001. Complaint ¶¶ 46-47. In addition, the Complaint alleged that the Memorandum provided misleading and unrealistic financial information. Complaint ¶¶ 50-53.

Based on its factual allegations, the Complaint alleged eight separate causes of action. Counts III and IV are the only counts relevant here, as Dunn has appealed only the two claims arising under the Virginia Securities Act (the "Act").[4] Count III alleged violation of sections 13.1-502 and 13.1-522(A) of the Act.[5] Complaint ¶¶ 88-92. Section 13.1-502 prohibits selling securities by means of an untrue statement or omission of a material fact.[6] Section 13.1-522(A) creates

---

[4]In the Complaint's six counts not on appeal, Dunn alleged violations of various federal and Maryland securities laws, common law fraud, and breach of contract.

[5]The Virginia Securities Act is an adoption, with some variations, of the Uniform Securities Act of 1956. Section 13.1-522(A) is modeled after section 410(a) of the Uniform Securities Act. Section 410(a) has since been revised and can now be found at section 509(b) of the 2002 version of the Uniform Securities Act.

[6]Section 13.1-502 makes it unlawful, in the offer or sale of any securities, to "obtain money or property by means of any untrue statement of

civil liability for the sale of a security by means of such an untrue statement or omission.[7] Count IV alleged violation of section 13.1-522(C) of the Act, which provides for control person liability for violations of section 13.1-522(A).[8] Complaint ¶¶ 93-96.

On November 12, 2002, the Defendants again filed motions to dismiss pursuant to Rules 9(b) and 12(b)(6). In opposition to the motions, Dunn maintained that the Act does not require proof of scienter, reliance, or causation. The district court declined to address this contention, stating instead that, "even under Mr. Dunn's construction, the Virginia statute requires a material misrepresentation.[9] *Dunn v. Ronbotics Corp.*, No. 02-952, at 26 (E.D. Va. Feb. 20, 2003). The court went on to conclude that Dunn had failed to allege a material misrepresentation because the fact that Ronbotics's patents were still pending constituted publicly available information that a reasonable investor would have considered. *Id.* at 14-16, 26. In addition, the court concluded that the claims against Davis impermissibly relied on the concept known as "group pleading" rather than alleging specific actions on her part. *Id.* at 28-29. On these bases, the court dismissed the Complaint.[10] *Id.* As noted, Dunn appeals only those claims arising

a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." Va. Code Ann. § 13.1-502.

[7]Section 13.1-522(A) provides that "[a]ny person who: (i) sells a security in violation of §[ ] 13.1-502 . . . , or (ii) sells a security by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) . . . shall be liable . . . ." Va. Code Ann. § 13.1-522(A).

[8]Section 13.1-522(C) provides that "[e]very person who directly or indirectly controls a person liable under subsection A or B of this section . . . shall be liable . . . ." Va. Code Ann. § 13.1-522(C).

[9]Like the court below, we refer to both an untrue statement of a material fact and an omission of a material fact as a "material misrepresentation."

[10]The court entered an order granting the Defendants' motions to dismiss on December 16, 2002, stating that the reasons for dismissal would be explained in a forthcoming memorandum order. *Dunn v. Ronbotics Corp.*, No. 02-952 (E.D. Va. Dec. 16, 2002). The memorandum order was entered on February 20, 2003. *Dunn v. Ronbotics Corp.*, No. 02-952 (E.D. Va. Feb. 20, 2003).

under the Act, i.e., Counts III and IV.[11] We possess jurisdiction pursuant to 28 U.S.C. § 1291.[12]

## II.

We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6). *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). We also review de novo a court's dismissal on the basis of Rule 9(b), because "lack of compliance with Rule 9(b)'s pleading requirements is treated as failure to state a claim under Rule 12(b)(6)." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999).

## III.

In assessing whether the district court erred in dismissing Counts III and IV of the Complaint, we must first determine whether the Complaint sufficiently alleges material misrepresentations on the part of the Defendants, and we must then examine the Defendants' contention that we should imply elements of reliance and causation into the Act. Finally, we must assess whether the allegations against Davis in Counts III and IV impermissibly relied on the group pleading presumption. As explained below, we reject the Defendants' contentions and conclude that Counts III and IV were erroneously dismissed.[13]

---

[11]On December 10, 2002, the court entered default judgment against Ronbotics in the sum of $579,848. Ronbotics has never appeared in the litigation, and the Ronbotics judgment is not an issue on appeal.

[12]The district court possessed federal question and diversity jurisdiction over this dispute. *See* 28 U.S.C. §§ 1331-32. Although Dunn appeals only the Virginia causes of action, jurisdiction remains because the parties are of diverse citizenship — Dunn is a citizen of Maryland and the Defendants are citizens of Virginia. *See id.* § 1332.

[13]Because the only issues on appeal relate to the state law claims, we need not assess whether the allegations satisfy the heightened pleading requirements for federal securities fraud claims enacted in the Private Securities Litigation Reform Act of 1995. *See* 15 U.S.C. § 78u-4(b).

## A.

We first consider whether the district court correctly concluded that the alleged misrepresentations were not material. In so doing, we recall that "a fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 356 (4th Cir. 1996)); *see also TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (setting forth "total mix" standard).

In applying this materiality standard, we must bear in mind that it does not require proof that an investor would not have invested had he known the truth; rather, the reasonable investor standard requires "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]." *TSC Indus.*, 426 U.S. at 449. In addition, we are mindful that, "[i]n general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss. Thus, we review the complaint only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality." *Bielski v. Cabletron Sys., Inc. (In Re: Cabletron Sys., Inc. Secs. Litig.)*, 311 F.3d 11, 34 (1st Cir. 2002) (internal citation omitted); *see also Anderson v. Clow (In re Stac Elecs. Secs. Litig.)*, 89 F.3d 1399, 1405 (9th Cir. 1996). As explained below, we conclude that Dunn has sufficiently pleaded misrepresentations that, if factually supported, would present a jury question as to their materiality.[14]

---

[14]In reaching this conclusion, we are, of course, cognizant that we are reviewing a Rule 12(b)(6) dismissal rather than an award of summary judgment. Therefore, our determination that Dunn's allegations are sufficient is based on the assumption, required on review of a 12(b)(6) motion, that Dunn can prove those allegations. *See De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991). We intend no implication as to whether Dunn possesses a sufficient *factual* basis to proceed to trial; we merely conclude that his *allegations* are adequate to survive a motion to dismiss.

1.

a.

First, a reasonable jury could conclude that the Defendants' misrepresentations concerning their ownership of the patents were material. The Complaint alleges that the Defendants "represented to Dunn that the patents were the most valuable and primary assets of Ronbotics." Complaint ¶ 31. A reasonable investor would undoubtedly attach significance to whether the company in question actually owned what it deemed its "most valuable and primary assets," as opposed to merely anticipating owning them in the future. The belief that a company currently possesses property that, in fact, it only hopes to possess would cause a reasonable investor to misassess the risk of his potential investment. Unbeknownst to Dunn, he faced a substantial risk that Ronbotics would never own its "most valuable and primary assets"; that is, the patent applications could well have been rejected.[15] That Ronbotics eventually obtained patent rights does not alter the fact that, when Dunn was faced with the decision whether to invest, the company did not possess those rights. A reasonable jury could find that, to a reasonable investor, the knowledge that Ronbotics risked rejection of its patent applications would have assumed actual and substantial significance. *See TSC Indus.*, 426 U.S. at 449.

b.

i.

On the other hand, the Defendants contend that the total mix of information available to Dunn included the fact that Ronbotics's patents were pending at the time Dunn made his investment, because such information was publicly available and readily obtainable. The Act does not, however, impose any duty to investigate upon a pur-

---

[15]In 2001, the year Dunn made his investment, fifty-three percent of patents applied for were awarded by the United States Patent and Trademark Office. *See* U.S. Patent Statistics, Calendar Years 1963-2001, *available at* http://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_stat.pdf (reporting that, in 2001, 183,975 patents were awarded out of 345,732 applications filed).

chaser, and the court thus impermissibly imposed a due diligence requirement upon Dunn.

Most importantly, the plain language of sections 13.1-502 and 13.1-522(A) of the Act does not impose on a purchaser of a security the duty to investigate a seller's statements. Section 13.1-502(2) imposes no obligation on the buyer but merely declares it illegal, in the offer or sale of securities, to obtain money or property by means of a material misrepresentation. As for section 13.1-522(A), the Act requires simply that "the purchaser not know[ ] of such untruth or omission." There is nothing in the Act indicating that this phrase implies constructive knowledge as well as actual knowledge. The Complaint, read in the light most favorable to Dunn, alleges that he had no actual knowledge of the Defendants' misrepresentations, and the Act does not impose a duty to investigate upon him.[16]

Our construction of the Act is consistent with the manner in which other courts have construed similar statutes modeled on section 410(a) of the Uniform Securities Act. For example, in *MidAmerica Federal Savings and Loan Ass'n v. Shearson/American Express, Inc.*, 886 F.2d 1249 (10th Cir. 1989), the Tenth Circuit had occasion to construe section 408(a)(2) of the Oklahoma Securities Act, Okla. Stat. Ann. tit. 71, § 408(a)(2) (West. Supp. 1989), a nearly identical statute to section 13.1-522(A) of the Act. Observing that "[s]ection 408 is designed to protect purchasers," the court concluded that the Oklahoma statute required that the plaintiff demonstrate only a lack of actual knowledge of the misleading statement or omission, and it thus "decline[d] to impute constructive knowledge of the information contained in the prospectuses to [the plaintiff]." *MidAmerica Fed. Sav. & Loan Ass'n*, 886 F.2d at 1254-55.

---

[16]In fact, the only due diligence requirement the Act imposes is on the *seller*, creating liability for a seller "who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission . . . ." Va. Code Ann. § 13.1-522(A). The juxtaposition of this language with the simple requirement that "the purchaser not know[ ] of such untruth or omission" serves to emphasize that the statute places a different duty on the seller than on the purchaser.

Similarly instructive are judicial constructions of section 12(2) of the federal Securities Act of 1933, 15 U.S.C. § 77*l*(a)(2), a statute substantially identical to section 13.1-522(A) of the Act.[17] In *Wright v. National Warranty Co.*, for example, the Sixth Circuit construed section 12(2) to "bar[ ] recovery only when a plaintiff has actual knowledge that a representation is false or knows that existing information has been withheld." 953 F.2d 256, 262 (6th Cir. 1992). Notably, the Eighth Circuit reached the same conclusion in *Alton Box Board Co. v. Goldman, Sachs & Co.*, in which it explained that "[t]he district court's conclusion that [the plaintiff] 'should have been aware from the public record' of the financial condition of [the company in which he invested] and therefore was barred from recovery under § 12(2) . . . clearly is not the law." 560 F.2d 916, 919 n.3 (8th Cir. 1977); *see also Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1032-33 n.10 (5th Cir. 1990) (noting that "a purchaser who is actually ignorant that a seller's representation is inaccurate or incomplete may recover even though the full truth is apparent from materials in her possession"); *MidAmerica Fed. Sav. & Loan Ass'n*, 886 F.2d at 1256 ("A purchaser has no duty to investigate a seller's possible fraud and need not verify a statement's accuracy."); *Casella v. Webb*, 883 F.2d 805, 809 (9th Cir. 1989); *Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1229 (7th Cir. 1980); *Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 696 (5th Cir. 1971). In sum, we agree with these

---

[17]Like section 13.1-522(A) of the Act, section 12(2) of the federal act imposes civil liability on a person for the sale of a security by means of a material misrepresentation. *See* 15 U.S.C. § 77*l*(a)(2). Section 12(2) differs from section 13.1-522(A) in that the former imposes liability for offers as well as sales, requires a nexus to interstate commerce, and provides that the securities offer or sale must be "by means of a prospectus or oral communication." *Id.*

As the Draftsmen's Commentary to section 410(a) explains, "[t]he resemblance [of section 410(a)(2)] to §12(2) of the Securities Act of 1933 . . . will once more make for an interchangeability of federal and state judicial precedence in this very important area." Louis Loss, *Commentary on the Uniform Securities Act* 147 (1976); *see also Furr v. Echols*, 36 Va. Cir. 349, 349-50 (1995) ("Virginia courts will look to interpretations of the federal securities laws when called upon to construe the Virginia [Securities] Act.") (citing *Ascher v. Commonwealth*, 408 S.E.2d 906 (Va. Ct. App. 1991)).

authorities and with the observations of a leading commentator on Blue Sky Laws, Joseph C. Long, that "[t]he investor has no due diligence obligation to make any investigation concerning the investment or to verify any information. The [Uniform] Securities Act was intended to reverse the age-old concept of caveat emptor and replace it with the concept of caveat venditor or seller beware. Therefore, the investor is not charged with information which he might have acquired or with constructive knowledge." Joseph C. Long, 12A *Blue Sky Law* § 9:24 (2003).

ii.

The Defendants nonetheless maintain that our decision in *Phillips v. LCI International, Inc.*, 190 F.3d 609 (4th Cir. 1999), mandates a contrary result and that the ruling of the district court should be affirmed. In *Phillips*, we considered a situation in which the defendants had asserted that their company was not for sale when, allegedly, they were in ongoing negotiations to sell it. Our distinguished panel explained that, "[i]f what [the defendant] actually said here [that the company was not for sale] is examined in the context of all of the information publicly available, we believe that a reasonable factfinder could not conclude that the contested statement constitutes a material misrepresentation." *Id.* at 615. Based on this observation, the Defendants maintain that *Phillips* requires us to charge Dunn with knowledge that the patent applications were pending.

A careful examination of the *Phillips* decision leads us to conclude otherwise. First, the *Phillips* plaintiffs did not assert state blue sky claims, but instead brought federal claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Such federal claims have no statutorily-defined elements; rather, they were judicially created.[18] *See Basic Inc.*, 485 U.S. at 230-31. And because the causes of action under section 10(b) and Rule 10b-5 are implied, the responsibility of defining those claims rests with the courts. *Gerhard W. Gohler, IRA v. Wood*,

---

[18]Section 10(b) and Rule 10b-5 do not explicitly create a cause of action — they simply provide that certain sales of securities by deceptive means or material misrepresentations are unlawful. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

919 P.2d 561, 565 (Utah 1996). In this dispute, however, the cause of action has been created by the Virginia General Assembly and codified at section 13.1-522 of the Act. It would be inappropriate for us to augment a Virginia cause of action with a requirement that does not appear on the face of the statute. *See id.*; *E.F. Hutton & Co. v. Rousseff*, 537 So. 2d 978, 981 (Fla. 1989).

Second, the consideration of all publicly available information was logical in *Phillips* because there the plaintiffs were relying on a "fraud-on-the-market" theory. *Id.* at 617. That theory authorizes a plaintiff to demonstrate reliance (as required for the federal claims at issue in *Phillips*) based on a presumption that he relied on the integrity of the market, as reflected in the company's stock price. *See Longman*, 197 F.3d at 682 n.1. In such a situation, the "reasonable investor" is the market itself; therefore, courts charge the *market* with knowledge of all publicly available information, because such information is exactly what affects the market price. *See Basic Inc.*, 485 U.S. at 243-48. This dispute differs significantly from *Phillips* in that we are obligated to examine materiality from the viewpoint of a reasonable purchaser, not the market, and thus we need not deviate from our previous conclusion that Dunn is not charged with knowledge of all publicly available information.[19]

2.

The Complaint also makes allegations that, if sufficiently proven,

---

[19]We recognize that, in *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, we required "minimal diligence" on the part of a plaintiff who was not relying on a fraud-on-the-market theory. 132 F.3d 1017, 1027-28 (4th Cir. 1997). However, this discussion in *Banca Cremi*, like *Phillips*, involved federal claims asserted under section 10(b) and Rule 10b-5, for which the federal courts are free to define the requirements. Furthermore, our analysis of the federal claims focused solely on the issue of justifiable reliance — an element of section 10(b)/Rule 10b-5 claims. And whether a plaintiff's reliance was justifiable would certainly require consideration of whatever information was readily available. Because reliance is not an element of Dunn's claims, *see infra* pp. 16-18, *Banca Cremi* does not require that we consider whether Dunn's actions were justified.

would present a jury question concerning the Defendants' failure to inform Dunn that it had reassigned its patent rights to Borta. On May 28, 1998, unbeknownst to Dunn, Davis had executed an Agreement to Reassign on behalf of Ronbotics. In that Agreement, Ronbotics, which had been assigned the patent rights to Borta's electric motion platform and control system, agreed to reassign those rights to Borta upon the occurrence of any of a number of specified events. One such event was Ronbotics defaulting on its obligations and seeking bankruptcy protection. The Defendants failed to disclose to Dunn that, if Ronbotics were to file for bankruptcy, Borta would regain all patent rights in the electric motion platform and its control system. A jury could conclude that this omitted information would have been significant to a reasonable investor, in that such an investor would consider whether, in the event of Ronbotics's bankruptcy, the company's most substantial assets would be available for creditors such as himself. Assuming Dunn's allegations are true, the Defendants' failure to inform Dunn of the Agreement to Reassign thus presents a plausible question as to materiality.

3.

The district court also decided that the Defendants' representations concerning Ronbotics's business prospects constituted mere "puffery" and were therefore insufficient to support an allegation of fraud. As the court observed, the judiciary has long distinguished between mere puffing statements utilizing opinion and exaggeration to pitch a sale, on the one hand, and factual statements that constitute fraudulent misrepresentations, on the other. The Supreme Court has explained that "when a proposed seller goes beyond [mere exaggeration of the qualities which an article has], assigns to the article qualities which it does not possess, does not simply magnify in opinion the advantages which it has but invents advantages and falsely asserts their existence, he transcends the limits of 'puffing' and engages in false representations and pretenses." *United States v. New S. Farm & Home Co.*, 241 U.S. 64, 71 (1916) (reversing dismissal of indictment for fraudulent sales of swamp land in Florida because misrepresentations did not constitute mere puffery); *see also Miller v. Premier Corp.*, 608 F.2d 973, 981 (4th Cir. 1979) (observing that "an unspecific and false statement of opinion such as occurs in puffing generally cannot constitute fraud").

In his Complaint, Dunn does not allege mere exaggeration and opinion, nor does he assert that the Defendants promised him a great investment or an amazing return on his money. Instead, Dunn alleges very specific misrepresentations on the part of the Defendants: that Ronbotics had sold 225 CoasteRider units, Complaint ¶ 46; that SEGA, Namco, and Gaelco were designing products using Ronbotics's technology, Complaint ¶ 36; that Ronbotics was in negotiations with General Electric, Betson, Atlas, State Sales, and other major companies, Complaint ¶¶ 40-43; that Ronbotics planned to introduce in early 2001 a product simulating gravitational forces with two degrees of freedom, and would feature its motion theater with three degrees of freedom, Complaint ¶¶ 44-45; and that Ronbotics was negotiating with a particular manufacturing facility in Oklahoma to handle overflow production, Complaint ¶ 48. These specific factual allegations regarding Ronbotics's business dealings and prospects are not simply sales pitches but rather can be proven true or false — and, if properly supported, could be found material by a reasonable jury. *See generally Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 & n.1 (4th Cir. 1993) (declaring as inactionable puffery statements that company expected certain growth rate and was poised to carry that rate into future and distinguishing *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1259 (4th Cir. 1993), in which we held that representations of specific business projects, including negotiations with insurance company that would act as guarantor, were actionable). Counts III and IV are therefore sufficient to state claims against the Defendants under the Act.[20]

---

[20]The Complaint also alleges additional misrepresentations by the Defendants, including providing misleading growth projections based on unrealistic figures. Complaint ¶ 50. Although financial projections are often held not to constitute material misrepresentations, "projections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994). The Complaint asserts that the projections lacked a reasonable basis, *see* Complaint ¶ 51, and therefore sufficiently presents a question as to whether a reasonable investor would consider the projections significant.

Similarly, the Complaint alleges that the Defendants: (1) failed to provide requested year-end financial statements and falsely explained that

B.

The Defendants also maintain on appeal that, even if the Complaint alleges material misrepresentations, the Act should be construed as requiring both reliance and causation, which the Complaint does not allege. As explained below, we are unable to construe the Act as requiring these elements.

The necessary starting point for determining the elements of a claim under section 13.1-522(A) — the text of the statute — does not include any reference to either reliance or causation. Its only provision that could arguably be read to imply a requirement of reliance or causation is the phrase "by means of an untrue statement." Va. Code Ann. § 13.1-522(A)(ii). And the pertinent authorities are to the contrary. First, according to the Draftsmen's Commentary to section 410(a), "[t]he 'by means of' clause . . . is not intended as a requirement that the buyer prove *reliance* on the untrue statement or the omission." Louis Loss, *Commentary on the Uniform Securities Act* 148 (1976). We implied as much in *Johns Hopkins University v. Hutton*, in which we rejected a "causation" theory as "an impermissible attempt to introduce reliance . . . as a necessary element of Section 12(2)." 422 F.2d 1124, 1129 (4th Cir. 1970). In so ruling, we characterized as a "similar ploy" an argument that was summarily rejected in *Demarco v. Edens*, 390 F.2d 836, 841 (2d Cir. 1968), in which "the seller sought to defend on the ground that the sale was not 'by means of' an offending circular." *Johns Hopkins Univ.*, 422 F.2d at 1129-30.

Furthermore, as the Seventh Circuit has correctly explained, "[a]lthough the 'by means of' language in the statute requires some

Ronbotics's Chief Financial Officer had only recently been hired, and (2) falsely implied that Davis and Borta had personally made substantial financial investments in Ronbotics. Complaint ¶¶ 52-53. A reasonable jury could conclude, if these allegations were proven, that a reasonable investor would consider these falsehoods significant. *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("[O]nly if the . . . materiality of the statement is so obvious that reasonable minds could not differ [is this] issue[ ] appropriately resolved as a matter of law.") (internal quotations and alteration omitted).

causal connection," the statute in question (section 12(2)) "imposes liability without regard to whether the buyer relied on the misrepresentation or omission." *Sanders*, 619 F.2d at 1225. According to the Supreme Court, "[t]here is, however, more than one way to demonstrate the causal connection." *Basic Inc.*, 485 U.S. at 243. In this situation, the connection is created through the privity required by section 13.1-522(A), that is, that the seller of the security "shall be liable *to the person purchasing such security from him . . . .*" (emphasis added). *See Gerhard W. Gohler, IRA*, 919 P.2d at 565-66 ("Privity . . . establishes the necessary link between the alleged misrepresentation and the plaintiff's injury and therefore serves the same purpose as the reliance requirement of common law fraud and the federal implied cause of action."). The plain language of section 13.1-522(A) of the Act therefore does not include the elements of reliance and causation.

Indeed, the Defendants do not contend on appeal that the statute explicitly contains these elements; rather, they urge that these elements should be implied by the judiciary, asserting, "[i]n the absence of legal precedent, Appellees submit that both of these requirements should be implied into the Virginia Securities Act."[21] Because the Act fails to mention reliance or causation, however, it would be inappropriate for a court to imply them. *See Schmidt v. Goddin*, 297 S.E.2d 701, 704 (Va. 1982) (declining to read additional requirements into a statute because the court is "not permitted to add words to a statute or to accomplish the same result by judicial interpretation").[22]

Even were we to view the statute as ambiguous on the issues of reliance and causation, we would be compelled to reach the same

---

[21]A Virginia trial court has examined the required elements of a section 13.1-522(A) claim, concluding that "'in non-disclosure cases it is not necessary to allege and prove reliance and causation.'" *Williams v. Chamer*, 32 Va. Cir. 12, 23 (1993) (quoting *McCowan v. Sears, Roebuck & Co.*, 722 F. Supp. 1069, 1075 (S.D.N.Y. 1989)).

[22]In reaching this conclusion, we recognize that federal courts have implied the elements of reliance and causation into claims initiated under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. What the federal courts have done, however, is easily distinguishable, in that the federal cause of action is judicially created. *See supra* pp. 12-13.

result. First, our construction comports with the purpose of the Act, which "is intended to protect investors from fraudulent sales of securities." *Pollok v. Commonwealth*, 229 S.E.2d 858, 859 (Va. 1976). It is therefore proper to construe a statutory ambiguity, if any exists, in favor of the investor.

In addition, we have rejected similar contentions that the elements of reliance and causation should be implied into section 12(2) claims, which are practically identical to section 13.1-522(A) claims. *See supra* note 17. In *Johns Hopkins University v. Hutton*, we firmly rejected the suggestion that reliance was an element, explaining that, "[u]nder Section 12(2) . . . a buyer need not prove that he relied on the misstatement or omission. 'To say that purchaser reliance is a prerequisite to seller liability is to import something into the statute which is not there.'" 422 F.2d at 1129 (quoting *Woodward v. Wright*, 266 F.2d 108, 116 (10th Cir. 1959)); *see also Caviness v. DeRand Res. Corp.*, 983 F.2d 1295, 1304 (4th Cir. 1993); *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 373 (4th Cir. 1986). And other courts and commentators have reached the same conclusion with respect to similar adoptions of section 410(a). *See, e.g.*, *In re Westcap Enters.*, 230 F.3d 717, 726 (5th Cir. 2000) (Texas statute); *Gerhard W. Gohler, IRA*, 919 P.2d at 565 (Utah statute); *E.F. Hutton & Co.*, 537 So. 2d at 981 (Florida statute); *see also* Unif. Sec. Act § 509 (2002), official cmt. 4. ("Unlike the current standards on implied rights of action under Rule 10b-5, neither causation nor reliance has been held to be an element of a private cause of action under the precursor to Section 509(b) [i.e., section 410(a), whose language is mirrored by Va. Code Ann. section 13.1-522]."); Joseph C. Long, 12 *Blue Sky Law* § 5:15 (2003). We therefore decline to read the elements of reliance and causation into the Act, and Counts III and IV are not deficient in that regard.[23]

---

[23]We note that, were we to imply the elements of reliance and causation, Counts III and IV may nonetheless state claims under the Act. The Complaint includes allegations that Dunn relied on the Defendants' misrepresentations and that the misrepresentations caused his loss. *See* Complaint Parts H, J.

## C.

Finally, we turn to the district court's dismissal of Counts III and IV against Davis on the basis of Rule 9(b). The court concluded that Dunn's allegations failed to meet the specificity requirements of Rule 9(b) with respect to Davis because, "[i]n his 114-paragraph Amended Complaint, Mr. Dunn fails to plead how Ms. Davis, individually, contributed to the alleged fraud," relying instead on "impermissible group pleading." *Dunn v. Ronbotics Corp.*, No. 02-952, at 28-29 (E.D. Va. Feb. 20, 2003). On the contrary, the group pleading presumption (sometimes known as the "group-published information" presumption) is not a prohibition on forms of pleading; rather, it serves as a presumption that may be invoked *in favor* of a plaintiff. As the Fifth Circuit has explained, "'[g]roup pleading' allows a plaintiff to rely on a presumption that statements in company generated documents represent the collective work of those individuals directly involved in the company's daily management." *Schiller v. Physicians Res. Group Inc.*, 342 F.3d 563, 569 n.4 (5th Cir. 2003); *see also Decker v. GlenFed, Inc. (In re GlenFed, Inc., Secs. Litig.)*, 60 F.3d 591, 593 (9th Cir. 1995).

We have never addressed the issue of whether the group pleading presumption should be recognized in this Circuit,[24] and, because Counts III and IV satisfy the pleading requirements as to Davis without reliance on the presumption, we need not decide that issue today. This approach was taken by the First Circuit in *Bielski v. Cabletron Systems, Inc.*, 311 F.3d 11. There the court of appeals declined to address the question of whether the group pleading presumption should be applied because the complaint alleged that the officers and directors had access to information contrary to the company's public statements, that they had participated in making the fraudulent state-

---

[24]Several district courts in this Circuit have rejected the group pleading presumption. *See, e.g.*, *In re First Union Corp. Secs. Litig.*, 128 F. Supp. 2d 871, 888 (W.D.N.C. 2001) (concluding that "'group pleading' is clearly inconsistent with Rule 9(b)'s express requirements of specificity"); *Glaser v. Enzo Biochem, Inc.*, 2003 U.S. Dist. LEXIS 14121, at *18 (E.D. Va. July 16, 2003). *But see Andrews v. Fitzgerald*, 823 F. Supp. 356, 373-74 (M.D.N.C. 1993) (recognizing availability of group pleading presumption but declining to apply it).

ments and stock sales, and that they had signed certain forms. *Id.* at 40-41.

Similarly, Counts III and IV assert claims against Davis, not solely because of her position as an officer of Ronbotics, but because she was directly involved in making material misrepresentations to Dunn. Although Dunn refers to Borta, Linzmeyer, and Davis in short-hand form (naming them the "Individual Defendants"), he clearly explains, "[e]xcept where otherwise specified, 'Individual Defendants' is to include each or all of these individuals." Complaint ¶ 16. As a result, each allegation made concerning the Individual Defendants is a specific allegation against Davis. And Dunn explicitly alleges that the Individual Defendants "participated in the drafting, preparation, and/or approval of the written and oral statements complained of herein," such as the Memorandum. Complaint ¶ 18. Like the officers in *Bielski*, Davis is alleged to have had access to contrary information and to have personally participated in making the misrepresentations. The Complaint therefore provides Davis with fair notice under Rule 9(b) of the claims made against her in Counts III and IV, and they should not have been dismissed on this basis.

IV.

Pursuant to the foregoing, we reverse the dismissal of Counts III and IV of the Complaint and remand for such other and further proceedings as may be appropriate.[25]

*REVERSED AND REMANDED*

---

[25]Dunn also seeks our review of a magistrate judge's evidentiary ruling excluding his expert witness. In a Memorandum Order dated December 12, 2002, the magistrate judge excluded the expert's testimony on the grounds that it was rife with speculation and not based on professional methodologies. *Dunn v. Ronbotics Corp.*, No. 02-952 (E.D. Va. Dec. 12, 2002). The next day, Dunn filed objections to the magistrate judge's order pursuant to Federal Rule of Civil Procedure 72(a), and a hearing on the matter before the district court was scheduled for December 20, 2002. On December 16, 2002, however, the court dismissed the Complaint, and no ruling was made on Dunn's objections. In these circumstances, we remand on this issue as well.

NIEMEYER, Circuit Judge, dissenting:

Because the misrepresentations on which Edward Dunn allegedly relied in investing $500,000 in Ronbotics Corporation were not material and, in any event, did not cause Dunn's loss, I would affirm the district court's dismissal of Dunn's complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6).

Ronbotics was a small corporation formed to manufacture and develop electric motion platforms for arcade video games and training simulators. In January 2001, Ronbotics approached Dunn about investing in Ronbotics, giving him a "Confidential Information Memorandum" about Ronbotics' business. The memorandum was a business plan for Ronbotics that expressed its hopes and projections for profit, but it contained no traditional financial data, such as a balance sheet, income statement, or cash flow statement. Moreover, the document stated on its face:

> Neither the Company nor any of its respective affiliates, employees or representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of any of the information contained in this Memorandum or any other information (whether communicated in written or oral form) transmitted or made available to prospective investors, and each of such persons expressly disclaims any and all liability relating to or resulting from the use of this Memorandum or such other information by a prospective investor or any of their affiliates or representatives.

In addition to the memorandum, Dunn had a single, four-hour meeting in late January 2001 with the principals of Ronbotics, during which the principals expressed enthusiasm about their patented technology, which they said was worth millions of dollars and would justify Dunn's investment. They also expressed enthusiasm for the future of the company. Based on the memorandum and the single meeting, Dunn invested $500,000 in Ronbotics. He has alleged that in doing so, he relied principally on the value of the patented technology. His complaint asserts, "Dunn's primary interest in Ronbotics related to Ronbotics' patented technology, as represented by defendants." Skep-

tical even about this value, Dunn demanded a "convertible subordinated note" from Ronbotics in the face amount of $500,000.

After Ronbotics failed as a company, Dunn commenced this action and alleged his reliance on five misrepresentations made by Ronbotics in the Confidential Information Memorandum and at the January 2001 meeting, characterized as follows:

> First, Linzmeyer and Borta confirmed the existence [of] the patents and described them as two patents, one for a motion pinball machine, and the other for the electronic motion platform used in Ronbotics' principal product, the Coaster-Rider. Second, Linzmeyer and Borta stated on more than one occasion at the January meeting that the company owned the patents and had the assigned rights to them. Third, Linzmeyer and Borta made numerous statements to Dunn at the January meeting concerning the value of the patents, including the fact that they were "worth millions," and that they had been valued between $2 million to $4 million. Linzmeyer and Borta told Dunn that the value of the patents was based not only on their own opinion, but on the opinion of an outside investment firm that had valued the patents. . . . Fourth, Dunn also inquired of Linzmeyer and Borta at the January meeting what protection Ronbotics had against a competitor misappropriating the Ronbotics' technology, and Linzmeyer and Borta replied that the Ronbotics patents protected against such misappropriation. Fifth, in describing the value of the patents and in relating to Dunn the other assets of Ronbotics, the Individual Defendants directly and implicitly represented to Dunn that the patents were the most valuable and primary assets of Ronbotics.

Dunn then alleged that these representations were false in the following respects. First, he alleged that no patents had issued at the time the representations were made in January 2001; one patent was not issued until April 16, 2002, and the other was not issued until September 3, 2002. When they did issue, Borta was listed as the inventor and Ronbotics as the assignee. Second, Dunn alleges that the valuations conducted about the patents were overstated because they were based "on unrealistic three-year projections in which sales were projected to

exceed $843 million and operating profits were projected in the range of 55 percent of sales." Finally, the patents were misrepresented because Borta retained a security interest in the patents which would permit the patents to be reassigned to Borta on the occurrence of certain contingencies.

The district court reviewed the complaint in the context of all the arguments presented to it by counsel and concluded in part that the representations on which Dunn relied were not material. As the court explained:

> [A] reasonable investor would have considered the total mix of information which included the publicly available information that the patents were pending before the PTO. The court also finds that, although the valuation of the patents by an outside firm may have seemed high, Mr. Linzmeyer's and Mr. Borta's statements about the value of the patents were based on this independent valuation and were not misrepresentations.

I would add to what the district court observed a fact most important to the proper disposition of the issue: Despite the fact that the patents had not yet issued, Ronbotics and its principals nonetheless owned the technology when the representations were made, and patent applications protecting the technology were pending. Thus, Dunn's case hinges on the distinction he draws between pending patent applications and patents. Although this distinction would have been material had the patent applications been denied, the applications were granted, *confirming* patentability and the right to exclude the world from use of the technology. No competitor used the technology, nor could it have used the technology at the time of the misrepresentations. As a consequence, the procedural status of the patent applications could not and did not significantly alter the total mix of information made available to Dunn. Ronbotics' business was presented on the basis that it had the exclusive right to the technology in the patents, and any prospect for making a profit using that technology was not affected.

The fact that Ronbotics did not disclose that Borta, one of the principals of Ronbotics, retained a security interest in Ronbotics' patent

rights through a right of assignment upon the event of bankruptcy or other contingencies, was also not material. Dunn expressly subordinated his interest in Ronbotics to "all existing and future secured indebtedness of the Company." Moreover, Dunn made no inquiry about the company's secured debt, and its nature and amount are not alleged as misrepresentations in Dunn's complaint.

It is also apparent from Dunn's complaint that Ronbotics' misrepresentations as enumerated above did not cause Dunn's loss in the way required by Virginia Code Annotated § 13.1-522(a) (stating a securities violation when a person sells a security "by means of" a misrepresentation). As the majority agrees, "the 'by means of' language in the statute requires some causal connection . . ." between the misrepresentation and Dunn's loss. *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1225 (6th Cir. 1980). The majority asserts, however, that mere privity between Ronbotics and Dunn fulfills this requirement. I respectfully disagree. To support its point that privity alone can supply the necessary causal connection, the majority relies on the statement in *Basic* that "[t]here is . . . more than one way to demonstrate the causal connection." *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988). *Basic*, however, was a fraud-on-the-market case, in which a plaintiff can prove causation merely by establishing that the price he paid for the security was too high on the date of sale because the defendants had artificially inflated it. *See, e.g.*, *Gebhardt v. Con-Agra Foods, Inc.*, 335 F.3d 824, 832 (8th Cir. 2003). Indeed, *Basic* predicated this relaxation of the causation requirement on the observation that "modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases." *Id.* at 243-44. Here, where we have just such a face-to-face transaction, *Basic*'s statement as to causation is inapposite.

Under the circumstances of this case, where the patents eventually issued and the technology was fully and continuously protected, the misrepresentations about them were truly insignificant. Allowing Dunn to recover his entire investment because of a misrepresentation that could not have played a role in his loss obliterates causation entirely. It was a business risk *known to Dunn* that caused the failure of the company, not any misrepresentation about the procedural posture of the patent applications.

For these reasons and the other reasons more fully described by the district court in its February 20, 2003 order, I would affirm.